```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF TEXAS
 2                          LUBBOCK DIVISION

 3   UNITED STATES OF AMERICA,      )
               Government,          )
 4                                  )
     VS.                            )   CAUSE NO. 5:22-CR-099-H
 5                                  )
     J. NICHOLAS BRYANT, a/k/a      )
 6   J. Nicholas Newton Bryant,     )
               Defendant.           )
 7

 8        ----------------------------------------------------

 9                       SENTENCING HEARING
          BEFORE THE HONORABLE JAMES WESLEY HENDRIX
10                 UNITED STATES DISTRICT JUDGE

11                       MARCH 9, 2023
                         LUBBOCK, TEXAS
12
          ----------------------------------------------------
13

14                    A P P E A R A N C E S

15   FOR THE GOVERNMENT:
     UNITED STATES ATTORNEY'S OFFICE
16   1205 TEXAS AVENUE, SUITE 700
     LUBBOCK, TEXAS 79401
17   BY:  ANN HOWEY

18
     FOR THE DEFENDANT:
19   FEDERAL PUBLIC DEFENDER'S OFFICE
     1205 TEXAS AVENUE, SUITE 506
20   LUBBOCK, TEXAS 79401
     BY:  DAVID E. SLOAN
21

22

23
     FEDERAL OFFICIAL COURT REPORTER: MECHELLE DANIEL, 1205 TEXAS
24   AVENUE, LUBBOCK, TEXAS 79401, (806) 744-7667.  PROCEEDINGS
     RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT PRODUCED BY
25   COMPUTER-AIDED TRANSCRIPTION.
```

1                                    INDEX

2

3    DEFENDANT'S FIRST OBJECTION TO PRESENTENCE REPORT......    5

4    GOVERNMENT'S RESPONSE..................................    8

5    COURT'S RULING ON OBJECTION...........................   11

6    DEFENDANT'S SECOND OBJECTION TO PRESENTENCE REPORT.....   12

7    DEFENDANT'S THIRD OBJECTION TO PRESENTENCE REPORT......   15

8    GOVERNMENT'S RESPONSE.................................   17

9    GOVERNMENT'S EXHIBITS ADMITTED........................   18

10    COURT'S RULING ON OBJECTIONS..........................   19

11    ALLOCUTION............................................   33

12    DEFENDANT'S SENTENCING EVIDENCE/ARGUMENT...............   35

13    GOVERNMENT'S SENTENCING EVIDENCE/ARGUMENT..............   38

14    SENTENCING FACTORS....................................   43

15    SENTENCE BY THE COURT.................................   48

16    RIGHT TO APPEAL.......................................   51

17    OBJECTION TO SENTENCE.................................   52

18

19

20

21                              *  *  *  *  *

22

23

24

25

```
 1                       P R O C E E D I N G S
 2              THE COURT:  The Court calls the first case on the
 3    criminal docket, United States vs. J. Nicholas Bryant,
 4    Case 5:22-CR-099-1.
 5              Who is here on behalf of the defendant?
 6              MR. SLOAN:  David Sloan on behalf of Mr. Bryant.
 7    We're present and ready.
 8              THE COURT:  Thank you, Mr. Sloan.
 9              And for the United States?
10              MS. HOWEY:  Good morning, Your Honor.  Ann Howey
11    for the United States.  Ready to proceed.
12              THE COURT:  Thank you, Ms. Howey.
13              Mr. Bryant, good morning.
14              THE DEFENDANT:  Good morning.  How are you?
15              THE COURT:  Good.  Please tell me your full name.
16              THE DEFENDANT:  J. Nicholas Newton Bryant.
17              THE COURT:  Mr. Bryant, let's talk about your case
18    for a second and how we got here today.
19              You previously appeared before Magistrate Judge
20    Bryant back in November.  You pled guilty to Count 1 of the
21    information charging you with one count of wire fraud.
22              Judge Bryant found that your guilty plea was
23    knowing and voluntary and supported by a sufficient factual
24    basis, so he recommended that I accept your plea, and I did.
25    On December 2nd, I entered an order accepting your plea and
```

1  adjudging you guilty of the crime alleged against you.

2         Now, Mr. Bryant, I know this is the first time that

3  you and I are actually seeing each other during this process,

4  but I want you to know I'm very familiar with your case.  The

5  Court has read all the materials submitted by both sides, and

6  I'm ready to proceed today.  Okay?

7         THE DEFENDANT:  Yes, sir.

8         THE COURT:  Mr. Sloan, have you had an opportunity

9  to read the presentence report and its addenda and discuss

10 those with your client?

11        MR. SLOAN:  I have, Your Honor.

12        THE COURT:  Mr. Bryant, have you had an opportunity

13 to read your presentence report and its addenda and discuss

14 those with your attorney?

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  You understand we're here so I can

17 decide what sentence to impose?

18        THE DEFENDANT:  Yes, sir.

19        THE COURT:  All right.  Mr. Bryant, I'm going to

20 ask you to take a seat at counsel table.  I am--  Before you do

21 that, let me just explain what's going to happen.  I'm going to

22 resolve some objections to the presentence report.  I need to

23 decide what is the appropriate advisory guideline range before

24 we move on.  I'm going to hear from both attorneys.  I'll make

25 that decision.  Once that is decided, I'll bring you back up;

1    I'll from you; I'll hear from your attorney and the government

2    about what they think a reasonable sentence will be.  Okay?

3                    THE DEFENDANT:  Yes, sir.

4                    THE COURT:  All right.  Have a seat, sir.

5                    All right.  Mr. Sloan, you have filed many

6    objections to the presentence report.  I am familiar with them.

7    I have read the government's response and the probation

8    officer's multiple addenda.

9                    We can go one at a time.  If you don't want to be

10   heard on all of them, we can go only on the ones you want to be

11   heard.  So it's dealer's choice this morning.  Are there any

12   that you want to be heard on?  And if the answer is all of

13   them, that's fine.  We'll just dig through them.

14                   MR. SLOAN:  Well, I think, Judge, I prepared sort

15   of a summary of our position on the objections--

16                   THE COURT:  Go ahead.

17                   MR. SLOAN:  --at this point.

18                   Basically, my objections sort of fall into three

19   categories.  One is the--whether or not the position of trust

20   enhancement should be applied, and then the loss amount.  Those

21   are the two that affect the guidelines.

22                   And then there's a third objection that sort of

23   relates to the origin of the comparisons of Mr. Bryant to

24   Anna--Inventing Anna and Frank Abagnale.  That objection is--

25   I do want to talk a little bit about that, but not much, just

1    kind of explain how I got to that point.

2            In regard to the abuse of a position of trust, I

3    would note that at the time that these frauds were committed,

4    Mr. Bryant was twenty-three and twenty-four years of age.

5    There's three types of fraud: writing hot checks, a

6    misrepresentation that Mr. Bryant was a business executive or a

7    son of an oil tycoon or an employee of an oil company, and then

8    there's the--  That's in relation to the attempt to reopen an

9    oil well.  And then there's the--sort of the grabbing of luxury

10   items by pretending to be an oil company executive.

11           His misrepresentatives in regard to hot checks

12   were, the money was there when it wasn't.  That's not an abuse

13   of a position of trust; that's just lying.  His representations

14   that he was a business executive or a tycoon all related

15   basically to saying, I have money; I have the resources to do

16   this; I have a company behind me; that's how we're going to

17   reopen this oil well.

18           He did not set himself out to have special

19   expertise, like an investment advisor or an attorney or a

20   doctor.  He basically--all of his misrepresentations were, "I

21   have resources" or "I have wealth" that he didn't have.

22           And then that's sort of the same situation with the

23   luxury--theft of the luxury things.  He basically held himself

24   out to be a person with money.  He said, I'm an employee of

25   X company or Y company.  Sometimes the company was invented;

1    sometimes it was a real company that he pretended to be part

2    of.  But his position in those companies was not one of any

3    specialized expertise.  He's basically saying, "I have the

4    money to pay for this, and therefore, I am authorized to make

5    these charges," when he wasn't.

6              And the other scheme was related to the online--the

7    Veem stuff, and that was just a representation through fraud,

8    basically a very sophisticated check-kiting scheme to where he

9    would say, here's a receipt from the Veem company that says

10   you've been paid; let me fly on this charter plane, or let me

11   shoot these animals, or let me go to a hotel or whatever.

12             So it's our position that those misrepresentations,

13   especially given the fact that he's obviously a young person;

14   he doesn't have time to have accumulated the--like a CPA or

15   that type of expertise thing--and he never held himself out

16   that way.  He just said he had money.  And so it's our position

17   that that is not an abuse of a position of trust.

18             THE COURT:  Okay.  So you don't dispute that

19   imposters are appropriately enhanced with the specific offense

20   characteristics at times, but the thing--the position that you

21   are holding yourself out as must be a position of trust.  He

22   didn't do that, in your view.  It was just part of the fraud:

23   I'm rich; I'm going to scam you, but not I'm a CPA or I'm the

24   investment broker or I'm the operator, I'm the X, Y, and Z.

25             MR. SLOAN:  That's exactly right.

1          THE COURT:  Okay.  All right.  Ms. Howey, let me

2    hear the government's response to this before Mr. Sloan goes

3    on.

4          MS. HOWEY:  Well, first, Your Honor, I would say

5    age really doesn't matter--

6          THE COURT:  I agree.

7          MS. HOWEY:  --when we're looking at this imposter

8    application.

9          We want to look first at whether there's sufficient

10   indicia to the victim that he held a position of trust.  When

11   we're looking at the well reopening, that answer is yes.  First

12   of all, he knew this man.  It's our understanding he worked for

13   him.  This man knew he understood the oil and gas business in

14   West Texas.

15         He went beyond that, though, and he held himself

16   out to own a company.  It was a fictitious company.  He created

17   fictitious email addresses, a fictitious internet site, created

18   fictitious persons--a foreman named Slade; a bookkeeper named

19   Allison, I believe--and basically talked the talk.  The man who

20   he was scheming knew where this oil well was, or the purported

21   oil well was.

22         He went further.  He hired other people to bring

23   equipment to the site--

24         THE COURT:  And this is J6?

25         MS. HOWEY:  Yes, Your Honor.

1         And he created a situation where it looked like he
2    did hold that position, and because he held that position--
3    And, you know, as the Court knows, I spoke--or wrote in one of
4    the briefings that the oil and gas business is one in which
5    business is done on a handshake, and the defendant knew that,
6    and he knew how to talk the talk.  He knew what a well
7    reopening was.  He knew that this victim knew the same.  He
8    knew that that victim would know what equipment needed to be
9    there.  And he controlled the entire narrative.  After he set
10   up himself as an imposter, he held the entire narrative where
11   this man trusted him--

12             THE COURT:  Of course.  Yeah.

13             MS. HOWEY:  --and assumed he was reopening that
14   well.  And through that trust, he was able to commit his
15   crimes.

16             THE COURT:  Let me ask about--  I think the most
17   important thing you said is that he held himself out as the
18   owner.  In the presentence report, paragraph 15, it's kind of
19   the intro to this scheme, and it says:  Bryant pretended he
20   started a fake oil company, and then he swindled multiple
21   people as a result.  And for J6, which was what we're
22   discussing, it says he contacted this person that he knew, and
23   Bryant told the person that he knew that there was a job
24   reopening a well in Levelland, and if the person would front
25   payment to Bryant to do the work and then invoice the well

1    operator at completion of the job-- So it's not clear to me--I

2    don't doubt what you're saying, but do you have evidence or am

3    I missing it in the PSR that he told J6, I'm the owner of this,

4    and therefore, I'm in this unique position, and that should

5    increase your trust?

6              I don't see that in the PSR.  It doesn't mean it

7    didn't happen, but am I missing something?

8              MS. HOWEY:  No, Your Honor.  I do not think he held

9    himself out to own the well or have mineral interests or even

10   own the property.  It's my understanding that it was a

11   situation in which whoever owned the land contacted him, and he

12   would serve as a sort of contractor.  And that happens very

13   often in the oil and gas industry, as I'm told.

14             THE COURT:  So he held himself out as a contractor/

15   facilitator of this larger project?

16             MS. HOWEY:  Facilitator, yes.  And so you, J6,

17   front this money; I'm going to work this job.

18             And to Mr. Sloan's point about expertise, he was

19   able to talk the talk.  He held himself out as having expertise

20   and knowing how to reopen that well.  And so, as I said, J6

21   fronted that money, and he stood as a contractor, and--

22             THE COURT:  To hire more services, to hire people

23   to come do work?

24             MS. HOWEY:  Hire more services.  And in the end, J6

25   would be compensated from whoever the owner was.  You know, I'm

 1   not privy to the conversation--all the conversations,

 2   obviously, or who Mr. Bryant held out to own the well or wanted

 3   the well reopened.  But his job was to facilitate and contract

 4   all the services.  He sought funding from J6, and, of course,

 5   rather than using that money to reopen the well, as Mr.--the

 6   owner of J6 believed, he was spending it upon himself.

 7            THE COURT:  Okay.  All right.  I understand the

 8   parties' positions.  This is a close call in an unusual

 9   situation.  I'm going to sustain the objection.  The guideline

10   provides for a 2-level enhancement when the defendant abuses a

11   position of private trust or uses a special skill in a manner

12   that significantly facilitated the commission or concealment of

13   the offense.

14            It's difficult, because it's hard to slice between

15   just the general fraud when a swindler is swindling and what

16   crosses the line into representing a position of trust under

17   the guidelines.  There's no doubt that being an imposter is not

18   a deal-breaker for the specific offense characteristic, and he

19   was an imposter.  But every case I can find, the position is

20   some kind of unique position.  So I'll just rattle a few off

21   from the Federal Sentencing Guidelines handbook: stockbrokers,

22   CPAs, lawyers, medical doctors, money managers, attorneys,

23   licensed investment broker, U.S. marshal.  That's a fun one.

24            I did read *McConathy*, where someone held themself

25   out as an operator of a well who is out collecting investments

1    for the well.  Give me money; I'll operate this well; I'll give
2    you more money back.
3              That's essentially an investment broker, just in
4    the oil and gas industry.  That's not exactly what was
5    happening here.  It's close though.  It is close.  But
6    ultimately, this is just too close to just the normal fraud,
7    where he defrauded these folks but he didn't say, look, I'm the
8    X, Y, and Z in this company, and that puts me in a unique
9    position; you can trust me; and, therefore, give me money and
10   I'll give you more money back.
11             So I just don't have enough facts before me and
12   evidence before me to justify the enhancement.  So for all
13   those reasons, it's going to be sustained.
14             All right.  What's next?  And so that's a 2-level
15   reduction.  Correct?
16             MR. SLOAN:  Yes, Your Honor.
17             THE COURT:  Okay.  All right.  Go ahead.
18             MR. SLOAN:  The second is in regard to the loss
19   amount, and I have a number of objections on that.  And our
20   position has changed on one of them, the Big Shot Operator
21   deal.  The rest of them, I think, were--it's kind of the
22   Court's call.
23             So we have a number of hot checks, just plain old
24   hot checks.  Then we have the Veem scheme.  And then we have
25   the misrepresentation of him as different things, a rich oil

1    tycoon or whatever.  Ant it's our position just vanilla hot

2    checks, where he's paying an investigator and he doesn't have

3    the money in the account, falls outside of the scope of the

4    wire fraud, which is more the sophisticated stuff.  That's the

5    Court's call to make.

6            The second sort of category of objection is the--

7    relates to the vehicle that was purchased--or fraudulently

8    purchased and then resold.  It's our position that that's one

9    loss: the value of the vehicle.  And it's not the loss of the

10   two of them added together, because they still have the vehicle

11   to reduce that loss.  In this case, the loss amount is 27,000

12   over the 3.5 million, and that transaction alone, I think,

13   would bring it down under that.

14           In terms of the Big Shot Outfitters--and I just

15   want to clarify what happened there.  Mr. Bryant told me he had

16   agreed to shoot a $40,000 animal and that he didn't.  I was

17   unaware that it wasn't because he changed his mind; it was

18   because he got caught in the middle of it.  And that was

19   clarified in the response.

20           I did look at the Big Shot Outfitters website.

21   They do have some animals that are in the forty-thousand--they

22   have an $80,000 water buffalo I guess you can kill.  So the

23   representation that they don't have an animal that's 40,000--

24           THE COURT:  Not a deer?

25           MR. SLOAN:  Well, they had deer up to 32,000, and

1    then there's a separate category by inch of the antler rack

2    that's left unspecified to where it's, like--  They go up to

3    32,000, and then if you want an even bigger one, the price is,

4    like, negotiated.  So I anticipate there probably are some deer

5    out there that would run 40,000.

6                    But regardless of that--

7                    THE COURT:  Has your position changed on this one?

8                    MR. SLOAN:  My position on the objection has

9    changed--

10                    THE COURT:  Go ahead.

11                    MR. SLOAN:  --because he got a bill for 70,000 and

12   he said it was paid, so I think 70,000 is a legitimate loss

13   amount.

14                    THE COURT:  Okay.  So you're withdrawing that

15   objection?

16                    MR. SLOAN:  Withdrawing that objection.

17                    THE COURT:  All right.

18                    MR. SLOAN:  But I wanted to explain how we got

19   there.

20                    THE COURT:  I understand.  You're not the first

21   person that had a misunderstanding after a conversation with

22   your client, and you probably won't be the last.

23                    Go ahead.  That objection would have been overruled

24   in any event.  But the Big Shot Outfitters is withdrawn.  What

25   else?

1          MR. SLOAN:  That's it for the loss amount.

2          THE COURT:  Okay.  All right.

3          MR. SLOAN:  And then the third one relates to the

4    media stuff.  And the real issue in my mind is, where did this

5    Catch Me As You Can, Inventing Anna thing come from.  And I met

6    with Mr. Bryant.  He said, I had never heard of these people.

7          And we were talking about the interview.  I assumed

8    he meant before that interview happened.  And I took the

9    government's response back, and I said, here you are talking

10   about Inventing Anna and Catch Me If You Can before that

11   interview would have taken place.

12         He says, you're the one that brought that to me.

13         I said, I didn't bring that to you; I had never

14   heard of Inventing Anna.

15         He said, no, the first time you met with me.

16         I said, no, I didn't.

17         He said, when it was a target letter.  You read the

18   target letter to me.

19         I looked at the target letter.  It wasn't in there.

20   What was in there, which I did read to him, was an email that I

21   got on August 5th from the U.S. Attorney's Office.  It says:

22   David, I think you will find this Catch Me If You Can/Inventing

23   Anna case very interesting.  We're looking at over 1.5 million

24   in intended and actual loss, in addition to very serious

25   threats Bryant made against the mother of his child and her

1  mother.  There's quite a bit of evidence.  If you'll provide us

2  with a drive, we can copy the discovery for you next week.

3          That's the letter I read to him on August 5th or

4  shortly thereafter, my first meeting with him.  And that's

5  where he came up with--  That's why he said he had never heard

6  of it before I talked to him about it.

7          THE COURT:  So you stand by your representation to

8  the Court in one of your objections, if--and correct me if my

9  memory is mistaken, but you said, my client has never heard of

10 it before this, and so don't hold it against him that he's

11 talking to the press and talking about this?

12          MR. SLOAN:  Right.  And all of--

13          THE COURT:  And you stand by that because, in your

14 view, you read that communication from the U.S. Attorney's

15 Office to him, and that must be where he first heard about this

16 stuff?

17          MR. SLOAN:  I think that's right.  And I don't

18 see--I don't see a reference to Catch Me If You Can or

19 Inventing Anna prior to August 5th, or prior to that date.  So

20 I think that is where he came up with the idea that he's like

21 Leonardo DiCaprio or whatever.  So--  And I'll address that a

22 little more.  That is--that's it for the objections.

23          THE COURT:  Okay.  All right.

24          All right.  Ms. Howey, would you like to be heard

25 on any of that?

1        MS. HOWEY:  In regard to relevant conduct, we stand

2   on our briefing, Your Honor, and agree with the addendum.

3        In regard to the truck, we do not see that as

4   double-counting.  He took the truck off the first dealership;

5   never intended to return it.  That never entered his mind.

6   Instead, he took it somewhere else and obtained cash and never

7   returned that cash.  So we don't see that as double-counting.

8        Whether it was the first time Mr. Bryant heard of

9   Catch Me If You Can or Inventing Anna, somehow he learned about

10  Leonardo DiCaprio and more about the movie and the Netflix

11  special because the government provided the Court with a jail

12  call where he's discussing it with glee.

13       THE COURT:  Yeah, and--

14       MS. HOWEY:  And it's clear to me that--  And even

15  if it was the first time, he enjoyed it.  He revelled in the

16  comparisons, and that's the point.

17       THE COURT:  Okay.  Yeah, the timing--  Thank you

18  for the clarification, because if there was zero explanation,

19  that would have been relevant.  You have given me an

20  explanation, and as a result, when exactly he heard about it

21  doesn't matter to me.  It's not going to affect the sentence.

22  I don't care.  How he talked about it in those jail calls, we

23  do need to talk about.  We'll get there.

24       I assume--  So I've listened to those calls which

25  were attached to the government's sentencing memorandum--

1          MS. HOWEY:  Yes, Your Honor.

2          THE COURT:  --or response to the objections.  Okay.

3          Okay.  I assume the government wants to admit those

4     into evidence today.  Is that right?

5          MS. HOWEY:  Yes, Your Honor.

6          THE COURT:  So the two jail calls are Government's,

7     what, 1 and 2?

8          MS. HOWEY:  Yes, Your Honor.

9          THE COURT:  Any other evidence?

10          MS. HOWEY:  That would be Audio 1 and 2.

11          THE COURT:  Audio 1 and 2?

12          Any other evidence that you wanted to admit today?

13          MS. HOWEY:  I would like to admit the victim impact

14     statements from the second sentencing memorandum.

15          THE COURT:  Okay.  Any objection, Mr. Sloan?

16          MR. SLOAN:  No.

17          THE COURT:  All of those are admitted.  The

18     government will hold onto the originals.  And I have considered

19     those victim statements, and I have listened to the calls.

20          Okay.  Let me get through these objections, and

21     then we'll talk about communications from the defendant, okay,

22     and the phone calls.

23          On intended loss, the defendant objects to the

24     inclusion of three instances--three specific instances where he

25     wrote hot checks.  The defendant asserts that he didn't

1    represent himself as a fictitious company or use the internet

2    or other payment platforms, and so, in the defendant's view,

3    it's outside of the scope of relevant conduct.  The government

4    and Probation disagree.

5          Mr. Sloan and Ms. Howey, I'm sure you've figured

6    out by now that the members in the jury box, obviously, they're

7    just students from Lubbock Christian and the law school.

8    There's not usually a jury in sentences, so they don't hold any

9    special significance other than just they are observers and

10   they are students.

11         Okay.  Relevant conduct.  Under the guidelines for

12   groupable offenses, the guidelines provide that relevant

13   conduct includes all acts committed by the defendant that were

14   part of the same course of conduct or common scheme or plan.

15   You look to 3D1.2(d) to determine which offenses are groupable

16   and which aren't.  This is an offense that is under

17   Guideline 2B1.1, wire fraud, that is a groupable offense, and

18   so we are in the world of expanded relevant conduct.

19         Mr. Sloan, I assume you don't disagree with any of

20   that.  Correct?

21         MR. SLOAN:  No.

22         THE COURT:  Right.  Okay.  All right.  I'm going to

23   overrule the objection from the defendant.  I do find that

24   these acts are part and were part of the same course or conduct

25   or common scheme or plan as the offense of conviction.  Two or

1    more offenses constitute a common scheme or plan when they are,

2    quote, substantially connected to each other by at least one

3    common factor, such as a common purpose or a similar MO.

4             Here, the defendant's conduct and actions were

5    connected by a common purpose, to defraud his victims and to

6    milk them for as much money and goods as he could; and a

7    similar MO, deceiving the victims, writing bad checks, using

8    faulty payment platforms, representing that he had money that

9    he didn't and playing the role, as he has said.

10            Therefore, these offenses are part of a common

11   scheme or plan.  And even if they're not, they do qualify also

12   as the same course or conduct, because they are sufficiently

13   connected or related to each other as to warrant the conclusion

14   that they are part of a single episode, spree, or ongoing

15   series of offenses.

16            And, here, the conduct occurred in the midst of the

17   defendant's ongoing spree where he repeatedly defrauded victims

18   by way of hot checks, fake online payments, and false promises.

19   This is not some outlier way before or way after the heart of

20   the conduct here.  And so for that reason also, the objection

21   is overruled.

22            Okay.  Regarding the double--the allegation to

23   double-counted loss.  These are objections to paragraphs 57,

24   58, 63, and 64.  The defendant objects to inclusion of loss

25   amounts for both the Big Spring Ford event and the Big Man Auto

1    Group.  The government did file a clarification where it noted

2    that, although the truck at issue was eventually returned to

3    its rightful owner, Big Spring Ford, an intended loss should

4    still be assigned because the defendant did not return the

5    vehicle himself, nor did he intend to do so.  And the

6    government clarified that Big Man Auto Group did suffer an

7    actual loss of a little over $38,000, which it paid to the

8    defendant in cash for the truck.

9         Now, Big Man Auto Group did obtain another truck

10   from the defendant as a sort of insurance, but it does not have

11   title to that vehicle, so it cannot realize value from it.  In

12   any event, the defendant, in the government's view, would be

13   accountable for the intended loss.

14        For the reasons stated by the government and in the

15   PSR addendum, the objection is overruled.  The government's

16   clarification, which has been adopted by the addendum, is

17   sustained.

18        Next, the allegation that there's overstated loss

19   here regarding Pollard Ford--that's objections to paragraphs 23

20   through 26, and 75 through 76--the defendant asserts that even

21   though he fraudulently obtained a truck valued at almost

22   $63,000 from Pollard Ford, he should only be accountable for

23   the $15,000 hot check that he used as a down payment.

24        The government and Probation disagree.  Under

25   2B1.1, Application Note 3(A)(ii), intended loss means the

1    pecuniary harm that the defendant purposely sought to inflict

2    and includes any pecuniary harm that would have been impossible

3    or unlikely to occur.

4            Here, the defendant purposely sought to inflict a

5    total loss equal to the purchase price of the truck--62,900--on

6    Pollard Ford.  Just because he put down a fraudulent payment of

7    only a portion doesn't change the fact that he intended to

8    fraudulently obtain the whole value of the truck.  So that is

9    overruled.

10           The Big Shot or First Shot Outfitters has been

11   withdrawn.

12           We have resolved the position of trust enhancement.

13   That is sustained.

14           The clarification about the Levelland well does not

15   impact the guideline range, but that is overruled for the

16   reasons stated in the addendum and in the government's

17   response.

18           The clarification about victims, paragraphs 21 and

19   22, also, no impact to the guidelines, but this is that he

20   allegedly made good on his obligation to Hartman with cash and

21   equipment.  There's no evidence to support that.  Because

22   there's no evidence or, otherwise, a demonstration from the

23   defendant that the information contained in the PSR is

24   unreliable, I'm going to overrule that objection.  I find the

25   PSR does bear sufficient indicia of reliability.

1          Clarification about the charter flight,

2     paragraphs 48 to 49, the defendant disputes that he was ever

3     forced off a charter plane.  Overruled for the same reasons.

4     There's no evidence to make me question the PSR.  I do find

5     that it bears sufficient indicia of reliability.

6          And then the media interview, it's not going to

7     affect the sentence that I impose, the clarification anyway, so

8     those are overruled for the reasons stated in the addendum.

9     That's to paragraphs 97 to 105.

10          And then you object to the PSR's inclusion of

11     potential grounds for a departure.  I will hear you out in

12     argument as to what you think a reasonable sentence is, but I'm

13     going to overrule the objection.  I think it's proper for the

14     PSR to include those potential bases for departures or

15     variances.

16          Okay.  Mr. Sloan, I think I've resolved all of your

17     objections.  Have I missed any?

18          MR. SLOAN:  No, Your Honor, you haven't.

19          THE COURT:  Okay.  And, Ms. Howey, I sustained your

20     clarifying objection.  Were there any others from the

21     United States?

22          MS. HOWEY:  No, Your Honor.

23          THE COURT:  Okay.  I have a topic that I need to

24     address and I'd like to hear from both parties on, and it's

25     acceptance of responsibility.  Why should the Court grant a

 1    3-level reduction for acceptance of responsibility in light of

 2    his post-guilty plea telephone calls and statements that he

 3    made both to an acquaintance, whoever that person was on the

 4    phone, and to third parties, including members of the press.

 5           The guideline requires a clear demonstration of

 6    acceptance of responsibility, and I have--after listening to

 7    the calls and reading the quotes that he made to third parties,

 8    I do hesitate to find as a matter of fact that there's a clear

 9    demonstration of acceptance.  Before I make a ruling on that, I

10    wanted to give both sides an opportunity to address it.

11           Mr. Sloan?

12           MR. SLOAN:  Your Honor, I noted in those

13    communications that he makes statements of acceptance of

14    responsibility when he's talking to the press.

15           THE COURT:  He does.  I take that point.  He also

16    says them in the phone call.  In the middle of the phone call,

17    suddenly they're talking about how the judge might be

18    listening.

19           And the person he talks to says, I hope the judge

20    doesn't give you, you know, that long of a sentence.

21           And he says, "I do have to pay my price to

22    society," I think, something along those lines, or "pay my

23    debt."

24           And so there are these statements.  I was taught in

25    law school the quote of Oliver Wendell Holmes that we should

```
 1    think things, and not words.  So there are some isolated words

 2    of acceptance, but I'm concerned about all his other conduct.

 3              Go ahead.

 4              MR. SLOAN:  So this is actually--  I'm going to

 5    pull this from what was going to be my sentencing argument.

 6              THE COURT:  Okay.

 7              MR. SLOAN:  We have a 23-year-old alcoholic kid who

 8    is desperate for attention here.  He's trying to get rich.

 9    That's the--

10              THE COURT:  I thought he was twenty-six.

11    Twenty-six?

12              MR. SLOAN:  He was twenty-three and twenty-four

13    when the--

14              THE COURT:  Oh, at the time.  I see what you mean.

15    Okay.

16              MR. SLOAN:  He's trying to get rich by opening up

17    an oil well.  That oil well was never opened, so we don't know

18    if there was oil down there or not.

19              THE COURT:  Now, the government disputes that.  The

20    government says that was never his intent.  He just wanted to

21    get up-front money and it was all a ruse.  I'll hear from the

22    government on that, but in your view, he's actually trying to

23    open a well?

24              MR. SLOAN:  Yeah.  I think he was.  I think he was

25    hoping that the well would pay off and everybody would get
```

1    rich.  He's--  The private planes and luxury vacations where he

2    has always got his posse along, he's obviously trying to

3    impress these people.  He is posting things on social media.

4           And then he gets caught and he starts paying, in

5    prison time, for what he did.  That starts with his state

6    conviction.  And then suddenly he's being compared to Leonardo

7    DiCaprio and he's--The Daily Beast wants to talk to him, which,

8    I guess, is a big social media company, which they did that

9    despite us telling him not to.  He--  And I think with somebody

10   who has obviously got insecurities and an ego problem, getting

11   him to boast, I don't think, was much of a challenge.  And so

12   suddenly here's his chance to be famous or notorious, whatever

13   you want to call it, which is a big ego boost for him.

14          He didn't make a nickel off of what The Daily

15   Beast--what they drew in that story.  But she got him bragging,

16   and I don't think she particularly cared that she was adding

17   fuel to his fire today.  And I told him after the interview,

18   you're likely to pay in months and years for giving that

19   interview.

20          And--but in the interviews and in the statements,

21   he never said he didn't do it.  He came to this Court and he

22   said he did it.  He said he was guilty.  In regards to the

23   arguments that we've made today, none of them are saying he did

24   not commit these crimes.

25          THE COURT:  I agree.

1          MR. SLOAN:  And I think he has prepared a statement

2     to the Court where he acknowledges that he committed the

3     crimes.  He apologizes to his victims.  He wants to make right.

4          In regard to The Daily Beast interview, it's like,

5     okay, he's a big boy, he should have known better.  And it's

6     like there's a certain poetic justice in the fact that she sort

7     of misrepresented why she wanted to talk to him, and then he

8     fell for it, because that's what he did to all his of victims.

9          And I suppose everybody has a reason to be outraged

10    about the fact that he wants to be notorious or famous.  But on

11    the other hand, if he does make money from this, that's a

12    pretty good chance that the $1,250,000 that he stole might get

13    paid back.

14          And the acceptance of responsibility, my

15    understanding is, is comprised of two elements.  Number one,

16    you admit what you did and you don't say you didn't do it; and

17    number two is that you withdraw from further criminal activity.

18    And--

19          THE COURT:  That's two factors of a nonexhaustive

20    list.  But those are two factors.

21          MR. SLOAN:  I understand.

22          THE COURT:  He has admitted the crime.  I give

23    you--I take that point.  And, as far as we know, he has

24    withdrawn from criminal activity.

25          MR. SLOAN:  Right.

1          THE COURT:  There's no indication that he hasn't.

2          MR. SLOAN:  Right.

3          And as far as taking the opportunity to become

4    notorious or bragging about what he did, it's distasteful, but

5    I don't think it is a lack of acceptance of responsibility.  He

6    is also remorseful, and he has expressed that when he was

7    talking--  And the Court may say that's insincere because he

8    knows the judge is listening.  And there's certainly no saying

9    that Mr. Bryant has a record of being honest.  You know, I'm

10   not going to say that.

11         But if you're taking some of what he says and,

12   well, that's an indication of who he is, and then disregarding

13   some of what he says because he's a liar, then, I mean, that

14   kind of puts him in a position where he's basically--no matter

15   what he says, he's damned.  And obviously, he shouldn't have

16   done those interviews, and that's something that he and I went

17   around about, and he stopped press contact after that

18   conversation with me.  But I think that there was a lot of ego

19   stroking going on on the part of that reporter.  You know, my

20   story is more wild than their story; you should cover this.

21         And I understand that those comments are

22   distasteful, but I don't think they indicate a lack of

23   responsibility.  I think what they indicate is immaturity and

24   attention-seeking, which is--runs all through this case.

25         THE COURT:  Okay.

1          MR. SLOAN:  So in my mind, acceptance of

2     responsibility for what he did is still there.

3          THE COURT:  All right.  Okay.  Thank you,

4     Mr. Sloan.

5          Ms. Howey?

6          MS. HOWEY:  Yes, Your Honor.

7          THE COURT:  And, Ms. Howey, will you move the

8     microphone a little closer to you and just set it on top of

9     your code book maybe, or--  Okay.  Go ahead.

10          MS. HOWEY:  Is this better?

11          THE COURT:  Yes.

12          MS. HOWEY:  I would implore the Court to consider,

13     in a financial crime like this, we have victims who suffered

14     great losses.  And I do think, in one of those conversations,

15     he does admit that he understands people were hurt.  But

16     despite that, despite the admonitions from his counsel, he just

17     revelled in this Daily Beast article.

18          He called his friend--  I'm citing to the

19     government's sentencing memorandum on page 7, which references

20     Audio Exhibit 2.  He told his friend that they were going to

21     get paid for this shit and asked her to send the article link

22     to Inside True Crime.  This is a website that's maintained by

23     Matthew B. Cox, who is a true crime writer.  It's a man who he

24     reached out to himself in early August, when he knew--after he

25     had received the target letter.  I think that just shows an

```
 1    absolute lack of remorse and an acceptance with just the
 2    gravity of his crimes, the number of victims who suffered and
 3    the ways in which they suffered.
 4              Even after being transferred to Bailey County
 5    jail--I believe that might have happened in January; I'm not
 6    sure--he contacted a Texas Monthly journalist, the journalist
 7    who wrote the Daily Beast article, to just to let them know,
 8    I'm here now; let's continue this conversation.
 9              All of that after the very sobering event of
10    standing in a federal courthouse and pleading guilty to federal
11    crimes.  I do not see any acceptance of responsibility for the
12    gravity, the number of victims, and the crimes he committed.
13              THE COURT:  Okay.
14              MS. HOWEY:  Thank you, Your Honor.
15              THE COURT:  All right.  Thank you.
16              All right.  I'll make a determination on this after
17    I hear from the defendant.  So, Mr. Bryant, if you would join
18    your attorney at the podium, please.
19              Let me say, having resolved all outstanding
20    objections, I do adopt the PSR and PSR addendum's factual
21    findings and legal conclusions as my own, except as modified
22    today and except as potentially modified with the remaining
23    acceptance issue, which I will resolve shortly.
24              Sir, the statutory sentencing range--so the total
25    possible range of punishment here--is a term of imprisonment of
```

1   up to 20 years; a fine of $250,000, or both; and a period of

2   supervised release of up to 3 years.

3          All right.  Sir, you have the right to tell me

4   anything you'd like to tell me.  Currently, your guideline

5   range is a Total Offense Level--after the 2-level reduction for

6   removing the position of trust, you would be at a 26.  Your

7   total Criminal History Category--  That's your Total Offense

8   Level, is currently 26; your Criminal History Category is I;

9   and that would result in an advisory guideline range of 63 to

10  78.

11         Now, Probation has noted that there are factors

12  here that might warrant an upward departure or an upward

13  variance from that advisory range.  One of those is the idea

14  that your criminal history category might substantially

15  underrepresent the likelihood that you will commit more crimes

16  and the potential danger you pose to the community.

17         And specifically, the probation officer notes for

18  me that there are three related theft convictions that you

19  received no criminal history points for.  You were on three

20  concurrent probationary sentences while you committed this

21  federal offense, and there are six prior arrests that did not

22  result in convictions.  You have been subject to numerous

23  police reports that did not result in charges, and you have

24  four other pending matters.

25         I will not rely on the bare arrest record, of

1  course.  But it's that constellation of facts, and I do find

2  that the facts underlying all of those materials have a

3  sufficient indicia of reliability.

4        That's one category that the probation officer

5  said, maybe you want to go higher, Judge.  It's not a

6  recommendation; it's just a--Judge, you need to consider this.

7        The other is the aggravating circumstances that are

8  present.  The guidelines provide, in 5K2.0, that I can depart

9  from the range if I find there are circumstances not adequately

10  taken into account in determining the range in an exceptional

11  case if I determine that circumstances are present to a degree

12  substantially in excess of that which is ordinarily involved in

13  this kind of offense.  And the probation officer notes that

14  there may be here.

15        You have numerous victims, including small

16  businesses and individuals.  For years, you dodged multiple

17  charges, and you tormented your son's mother.  And after

18  pleading guilty, you participated in these interviews and you

19  had these phone calls where, arguably, you were proud of your

20  crimes and not remorseful for them.

21        That is your advisory range.  Your attorney is

22  going to get to argue to me anything he'd like to argue about

23  what a reasonable sentence is, but you also have the right to

24  tell me anything you would like to tell me.  You don't have to

25  say anything if you don't want to.  I won't hold it against you

1    if you don't.  Is there anything you'd like to say?

2               THE DEFENDANT:  Yes, sir.

3               THE COURT:  Go ahead.

4               THE DEFENDANT:  I would like to sincerely and

5    humbly apologize to all my victims and my family.  For years, I

6    watched their confusion at the chaos drugs and alcohol caused

7    in my life.  The seriousness of my actions had zero impressions

8    on my drug- and alcohol-induced mind.

9               These last 15 months I've been incarcerated have

10   shown me how devastating my choices have been on my life and

11   others.  I have failed as a father and a son.  I've wrecked

12   every relationship I've had, burned every bridge I've crossed.

13   I hurt so many people trying to be someone I am not.  I was a

14   greedy, unremorseful monster, hurting everybody in my path.

15              I'm 100 percent responsible for my actions that

16   have led me to this courtroom today.  I'm ready to make--ready

17   to pay my debt and restitution to society and my victims and

18   come out of my sentence a better man and father.

19              Thank you for giving me the chance to change my

20   life.  Thank you for my family for supporting me.

21              THE COURT:  All right.  Thank you, sir.  I

22   appreciate that statement, and I will take it into account.  I

23   wish I could believe everything you just said.  In light of

24   your statements, especially on the phone calls, it's very hard

25   for me to do so.  You have the right to talk to whoever you

1    want to talk to, but it's my obligation to determine whether

2    you have clearly demonstrated acceptance of responsibility.

3    And that statement that you just read falls well short of

4    mitigating your actual conduct.

5              And I have to judge people based on what they do,

6    and not their best intentions.  And, here, while I do recognize

7    that you have admitted that you committed this crime--  And I

8    don't doubt you, Mr. Sloan, that your client wanted attention.

9    I don't think he's in a catch-22.  I'm not picking and choosing

10   statements.  I don't give any credibility to these isolated

11   statements, because the remainder of the statements are him

12   speaking freely with a friend or third parties where he is

13   clearly revelling, and he has no incentive not to--in fact, he

14   had incentive not to talk about those things, and he couldn't

15   resist, and he--the guard is clearly down.

16             There's no doubt he wants to profit from this

17   crime.  There's no doubt there that he is proud of these

18   crimes.  He laughed at the idea of them on the calls.  The

19   person he was talking with noted that there was a commenter who

20   said--and I'm paraphrasing, but, "Yeah, he got me for $8,000;

21   I'm still waiting to get paid back for my 8,000," and they had

22   a collective laugh about that.  That response to a victim is

23   hard to understand and I can't ignore.

24             You also--  Another person put a gif up that said,

25   you know, "I'm still waiting for that wire transfer," and y'all

1   had a good laugh about that as well.  These are real people;

2   individuals, small businesses, large businesses.

3        And I have no doubt that you have failed to meet

4   the standard in the guidelines that must clearly demonstrate

5   acceptance.  You haven't.  If anything, all you have clearly

6   demonstrated is that you're proud.  You play a role.  I think

7   you're playing a role today.

8        I hope you prove me wrong.  Don't get me wrong.  I

9   hope that--okay, I have to prove to you with conduct?  I will.

10        And I hope that's the case.  But what's before me

11   right now, you have not clearly demonstrated responsibility--or

12   acceptance of responsibility, and so for those reasons, I am

13   going to remove it.

14        So that takes you from a 26 to a three--  Pardon

15   me.  You were at a 26.  I'm adding 3, because that 3-level

16   reduction is no longer there.  You're now at a 29, and as a

17   29-I, your advisory range is 87 to 108 months' imprisonment.

18        Mr. Sloan, I have heard from your client, and I

19   have tentatively concluded that an upward departure or variance

20   might be in order here for the reasons stated today and for the

21   reasons stated in the PSR and its addenda.  Any evidence or

22   argument on behalf of your client, Mr. Sloan?

23        MR. SLOAN:  Your Honor, in regard to the acceptance

24   of responsibility, that's composed of two parts.  There's the

25   two-level acceptance of responsibility, and there's an

1    additional level that the government moved for because of his

2    prompt decision to plead guilty--

3              THE COURT:  Right.

4              MR. SLOAN:  --and saving resources of the

5    government, and that should still be in play.

6              THE COURT:  So part--

7              MR. SLOAN:  I think it should be a 2-level

8    increase, not a 3-level increase.

9              THE COURT:  I disagree, but I'll hear you out.

10   Part B says, if the defendant qualifies for a decrease under

11   A--  So it's conditional.  So the 1-level additional decrease

12   under Part B is conditioned on me finding that he is qualified

13   under A.  He's not qualified under A, but in any--and so I

14   disagree.

15             Does that make sense?  Am I missing something?

16             MR. SLOAN:  It makes sense, Judge.

17             THE COURT:  Okay.  Ms. Howey, would you move--do

18   you--are you--regardless of this range, would the government

19   like me to decrease it by one?

20             MS. HOWEY:  Yes, Your Honor, the government does

21   move.

22             THE COURT:  Okay.  That's overruled.  I don't think

23   I can do so under the guidelines.  And so it is a 3-level

24   reduction, and we're at 87 to 108.  But, again, I have found

25   that--tentatively concluded that an upward departure or

1    variance might be in order.  But I've calculated the

2    guidelines.

3              Mr. Sloan?

4              MR. SLOAN:  Your Honor, it's our position that the

5    PSR--  You have identified some aggravating factors.  The PSR

6    identified some aggravating factors.  And there's essentially

7    two categories there.  There's the number of victims, the sort

8    of flagrant nature of the fraud.

9              And I would just say that number of victims is

10   included in the guideline calculation.  The quantity of the

11   fraud is included in the guideline calculation.  The prior

12   convictions are included in the loss amount.  So all of those

13   things were taken into account in arriving at what's a

14   relatively high guideline range for a fraud case.  So I believe

15   that those were adequately taken into account within the

16   guidelines as they are calculated in the PSR.

17             The second category is the arrests for which he was

18   not convicted regarding domestic violence and the situation

19   with his wife--

20             THE COURT:  I can tell you that's not going to--

21   that's not enough for me to upwardly depart or vary, so that's

22   not going to do it.

23             MR. SLOAN:  All right.  So for those reasons, we

24   believe a sentence within the guideline range is appropriate.

25             THE COURT:  Okay.

1          MR. SLOAN:  In addition, I would ask the Court to

2    make a placement recommendation to FCI Seagoville.

3          THE COURT:  That will be granted.  I'll make a

4    nonbinding placement recommendation for FCI Seagoville.

5          All right.  I have heard from your client.

6          Ms. Howey, anything--any argument or evidence--

7    We've already admitted, I guess, your evidence.  But any

8    argument from the United States?

9          MS. HOWEY:  Yes, Your Honor.  Just really quickly,

10   I want to clarify that I did agree with the revocation of that

11   third point.

12         THE COURT:  Oh, I see.  I misunderstood you.

13         MS. HOWEY:  I think I misspoke.

14         THE COURT:  No problem.

15         MS. HOWEY:  My apologies.

16         THE COURT:  No problem.

17         MS. HOWEY:  First, I do want to set the record

18   straight on the oil well.  Mr. Sloan spoke just moments ago

19   that perhaps--maybe I misunderstood him, but he understands

20   that there was an oil well and Mr. Bryant wanted to work to

21   reopen that well.

22         That is absolutely false.  There was--there may

23   have been oil wells on this property.  It's property that his

24   uncle owned.  Maybe they were working at one time.  I don't

25   know all the language in the oil and gas industry.  But he did

1   not intend to open an oil well.  It was not his land.  His

2   uncle did not even know he was on the land or had told people

3   that he would open a well on the land.  According to--

4           THE COURT:  Yeah, when uncle finds out, uncle said,

5   what are y'all doing here; get off--

6           MS. HOWEY:  Right.  Paragraph 19 in the PSR--

7           THE COURT:  --get out of here?

8           MS. HOWEY:  Yes, Your Honor.  So I want to set that

9   clear.  This isn't a situation where a businessman gets in a

10  situation where he's not able to complete the task he set.  He

11  never intended to open the oil well.  He just wanted money to

12  use as he pleased.

13          Second, Your Honor, I want to note that there is

14  nothing special about this defendant's crimes, nothing at all.

15  He repeated wire fraud over and over again, plain and simple.

16  We're talking wire fraud.  And he used the devices that we

17  often see in these cases.  We've already discussed, he created

18  fictitious businesses, websites, bank accounts even, fictitious

19  persons.  And then he used those devices to defraud

20  unsuspecting victims.  And as the Court said, these are real

21  people, real people; our neighbors, local businesses.

22          What is different about this case is the number of

23  victims.  The PSR discusses 56 different victims.  That's an

24  astounding number.  And what is really relevant here is to

25  speak for the victims.  Who were they?  Well, Mr. Bryant preyed

1    upon small business owners, and small business owners who were

2    desperately seeking to stay afloat during the pandemic.  He

3    attempted and was successful in defrauding small business

4    owners of $1.5 million in just the very start of the pandemic,

5    at a time when businesses were just trying to stay afloat.

6              THE COURT:  Didn't one of the aviation companies

7    also say, in effect, we were so glad to get a giant, you know,

8    contract for a private flight because COVID had stopped

9    everything, and now we're going to get an influx of, whatever,

10   $50,000 or whatever it was?

11             MS. HOWEY:  Yes, Your Honor.  It was excitement on

12   their part.  They didn't foresee any flights happening because

13   of the pandemic, and they were thrilled.  They were excited.

14   They knew they would be able to keep some employees on.  And

15   as, I think, I state in the sentencing memo, that excitement

16   just morphed to despair, and they were not able to recover.  I

17   don't know if they still have not been able to recover, but it

18   was quite a hit.

19             As we've discussed, he preyed upon colleagues,

20   friends, former employers in the oil and gas industry.  Of

21   course, that's an industry vital to this area, and it is one

22   that's built upon trust, reputation.  As I think I've already

23   said, business is often conducted on a handshake, and

24   Mr. Bryant knew that, and he capitalized on that.

25             In addition, I think it's important to note that he

1    preyed on what I see as America's ever-growing dependence on

2    payment applications, such as--you know, many of us in this

3    courtroom use Venmo, PayPal.  Evidently Veem is another

4    application.  Americans are growing to depend on those.  We

5    expect to send and receive money almost instantaneously.  And

6    he used Veem.  He used QuickBooks, and he capitalized on that.

7              He made it appear, through those applications, that

8    money was coming, and perhaps his victims thought money would

9    be instantaneous.  They relied upon that application to their

10   detriment.  Of course, the money never came, and in roughly an

11   18-month crime spree that spanned several states, this

12   defendant racked up a total of $3,523,564.05 in intended and

13   actual losses.  And he did it for the purposes of ostentation,

14   pretension, and Instagram moments and to feed his ego.  As

15   we've discussed, the damage to the victims is just

16   overwhelming.  And when you look at the number, it's

17   heartbreaking.

18             We've discussed this a little bit.  Despite that

19   devastation, this defendant is not contrite.  Although he,

20   perhaps in his view, expressed remorse today, I don't believe

21   it.  His actions speak otherwise.  We've already discussed

22   those actions.

23             And I do want to note for the record that the

24   defendant has continued to communicate with persons in the

25   media.  He believes they will promote his story.  This

1    behavior, to me, is very concerning, because it indicates that

2    he has no intention of changing his conduct or his view of his

3    crimes, and I believe his history--his criminal history

4    suggests the same.  As discussed in the PSR, he has had ongoing

5    interactions with law enforcement since the age of seventeen.

6    He has been given chance after chance after chance.

7           He was noncompliant with court conditions, even

8    when he was given those chances on probation, and he committed

9    almost all of the crimes in the crime spree that brings us here

10   today while under three different terms of probation.  And

11   that's astounding.  He clearly lacks respect for the law.  He

12   has demonstrated a complete inability to deter his conduct,

13   even after pleading guilty.

14          The United States asks for a just sentence that

15   would reflect the gravity of the crimes, the breadth of the

16   crimes, and that would deter this defendant's conduct, and that

17   would also send a message to others who would commit such

18   crimes in our community.  Thank you.

19          THE COURT:  Thank you, Ms. Howey.  Ms. Howey, do

20   you know any reason why the Court cannot lawfully impose

21   sentence at this time?

22          MS. HOWEY:  No, Your Honor.

23          THE COURT:  Mr. Sloan?

24          MR. SLOAN:  No, Your Honor.

25          THE COURT:  I've carefully reviewed the PSR and its

1   addenda.  I inform the defendant that the plea agreement is

2   finally accepted.  Judgment and sentence will be consistent

3   with it.

4          I am required by statute to impose a sentence that

5   is sufficient, but not greater than necessary, to comply with

6   the purposes of sentencing set forth in Section 3553(a)(2), and

7   to consider all the sentencing factors in that statute, which I

8   have done.

9          Mr. Bryant, all that really means, to translate

10  that for you a bit, is, I consider certain guideposts in every

11  case to try to figure out what's a reasonable sentence.  One of

12  those is the nature and circumstances of the offense, or what

13  did you do.

14         We've already talked at length about what you did.

15  Everybody knows what you did.  But suffice it to say that you

16  executed dozens, dozens of fraudulent schemes that victimized

17  numerous individuals and small businesses, and you did so not

18  over a short period of time, not in some short period of crisis

19  or emergency or need, but over a course of approximately

20  18 months.  And these schemes and this fraud were not small.

21  The intended and actual loss combined of approximately three

22  and a half million dollars.

23         Your fraud impacted numerous people across many

24  industries.  In one scheme, your victims contributed thousands

25  of dollars in money, equipment, and services to your sham

 1    business, and they were never compensated.  These are

 2    hardworking, salt-of-the-earth people.  You were not defrauding

 3    some giant oil company who has billions of dollars to spare.

 4    You defrauded the people in our community who are just trying

 5    to make it as a small business or individuals, pay the bills,

 6    give people jobs that allow them to put food on their table,

 7    and yet, you never hesitated.  Victim after victim, fraud after

 8    fraud, you did not stop.  You just continued to just

 9    double-down and double-down and double-down.  The only thing

10    that stopped you was being caught.

11          And, in fact, the first time, you know, you were

12    caught and you got in trouble at the State multiple times,

13    you're on probation for this type of offense and these related

14    offenses.  You didn't stop then.  Only when you're arrested and

15    taken out of rotation do you stop.  Until then, you played the

16    role and enjoyed it.  You revelled in your crimes then, and

17    you've continued to revel in your crimes to this day, in light

18    of those phone calls that I've heard and statements that you

19    have made to third parties.

20          You took what you wanted for just your own fun,

21    luxury vehicles, private flights, cruises, rental homes,

22    various goods and services.  The number of victims here is

23    greater than normal in wire fraud cases.  There's--I have a

24    sentencing later this afternoon.  It's wire fraud involving

25    over a million dollars, but it doesn't involve 30 victims or

1    40 victims or 50 victims.  It involves one victim.  And that's

2    what makes your crime exceptional in a bad way.

3             The total actual loss--Ms. Howey, I know that you

4    filed a new number recently.  I have the total actual loss,

5    which should also be ordered as restitution, of $1,185,691.38.

6    Is that correct, Ms. Howey?

7             MS. HOWEY:  That is correct, Your Honor.

8             THE COURT:  Okay.  And do you agree with that

9    number, Mr. Sloan?

10            MR. SLOAN:  I do.

11            THE COURT:  All right.  And that's the number that

12   should also be ordered for restitution, Mr. Sloan?

13            MR. SLOAN:  Yes, Your Honor.

14            THE COURT:  All right.  After you were caught, you

15   did make statements to the press, despite the advice of your

16   counsel, which just shows me your just dogged determination to

17   revel in what you did.  That's your choice.  Choices have

18   consequences.  If that's how you want to live, that's fine.

19   Those people don't go away on this side of the room.  They'll

20   be there for you if you want to keep making these choices.

21            I hope today is the day that you decide enough is

22   enough, but you have lost the benefit of the doubt from

23   everyone because of your own choices.  So you've got to start

24   living it in instead of just saying it.  Until then, I have to

25   sentence you based on what's before me.  And what's before me

1    is, over this lengthy period of time, so many victims and so

2    much loss.

3            This isn't the first time you've been in trouble.

4    You have had multiple interactions with law enforcement since

5    you were a teenager, and you have been given chance after

6    chance after chance.  I wish that prior and more lenient

7    sentences had deterred you from criminal conduct.  They

8    haven't.  Undeterred, you continued, and here we are today.

9            All this adds up to an incredibly serious crime.

10   It also demonstrates an incredible danger to society.  You have

11   no respect for the law, given your repeat fraudulent conduct.

12           I have to impose a just punishment, which weighs

13   very heavily here.  And I have to afford adequate deterrence of

14   criminal conduct.  That weighs heavily here.  And, as I have

15   said, protection weighs heavily as well.

16           I am familiar and aware of the general rule, as

17   noted in paragraph 188 of the PSR, that a term of

18   imprisonment--if a term of imprisonment resulted from another

19   offense that's relevant conduct to this offense of conviction,

20   generally, the Court should adjust the sentence for any period

21   of imprisonment already served on the undischarged term if I

22   determine that it will not be credited by the Bureau of

23   Prisons.  Further, in such a case, the remainder of that term

24   is usually run concurrently.

25           You have served 347 days for three state

1    convictions that are related theft; seven days in Case

2    Number 2019-418,105; seven days in 2020-419,435; and 330 days

3    in CR55024.  You've also served--  You were arrested in

4    December of 2021, and you've served an additional 445 days

5    since that time.

6              In light of the provisions explained in

7    paragraph 189 of your presentence report, I do find this is a

8    complex case involving multiple undischarged sentences that may

9    call for the application of different rules.  I will exercise

10   my discretion to fashion a sentence of appropriate length and

11   structure to achieve reasonable punishment.  So I'm not going

12   to provide any credits to the sentence that I impose; I'm just

13   going to--and I am aware of the time that you've spent in state

14   custody, and I'll take that into account in imposing a

15   reasonable sentence.

16             I have considered the arguments of the parties and

17   all the evidence before me, and I have determined that a

18   sentence within the advisory guideline range would not be

19   reasonable here.  A couple of reasons for that.  I do find this

20   is an exceptional case.

21             Mr. Sloan, I take your point that the guidelines do

22   account for the number of victims.  If there's--or--the

23   guidelines provide that if there's ten or more victims, you

24   increase by two levels.  Given that we're well past ten victims

25   in this case, I don't think two levels is sufficient, so I

1    don't think the guidelines sufficiently account for the scope

2    of the crimes here and the number of victims involved.

3            I do also find that his criminal history

4    substantially underrepresents the likelihood that he will

5    commit more crimes and the danger to the public.

6            So, after considering all of those factors, the

7    purposes of sentencing, and the parties' arguments and the

8    evidence that has been admitted, I have determined that a

9    sentence of 168 months is sufficient, but not greater than

10   necessary.

11           Now, I believe that the guideline calculations

12   announced today were correct, but, to the extent they were

13   incorrectly calculated, I inform the parties that I would have

14   imposed the same sentence without regard to that range, and I

15   would have done so for the same reasons, in light of the

16   3553(a) factors.

17           This sentence is going to run consecutively to any

18   sentence that may be imposed in Case Number 2019-735,716 and

19   2019-683,081.   Those are unrelated offenses.

20           But the sentence shall run concurrently, or at the

21   same time, as any sentence imposed in the following cases:

22   Case Number DC-2022-CR-110 pending in the 137th District Court

23   in Lubbock County; CR-2022-105-COD in the 5th Judicial District

24   Court of Parker County, Wyoming; and any probation revocation

25   in 2019-418,105 and 2020-419,435, both pending in the

1    137th District Court in Lubbock County, and any probation

2    revocation in Case Number CR55024 pending in the 385th Judicial

3    District Court of Midland County, Texas.

4              Upon release from imprisonment, you're going to be

5    on supervised release for a term of 3 years.  While on release,

6    you shall comply with all of the mandatory conditions of

7    release listed in your presentence report and in

8    Section 3583(d).

9              Mr. Sloan, did you and your client receive and

10   discuss my written notice of intent to impose the standard and

11   special conditions?

12             MR. SLOAN:  We have, Your Honor.  Mr. Bryant signed

13   that, and we filed it with the court.  We have no objections to

14   those conditions.

15             THE COURT:  Thank you, sir.

16             Hearing no objections, I do adopt them today, with

17   one change, and it's just the total loss--total restitution

18   amount, which I stated earlier.  So that will be adjusted.  And

19   you have no objection to that adjustment.  Correct?

20             MR. SLOAN:  That's correct.

21             THE COURT:  Okay.  I do find that all of these

22   conditions are reasonable and relate to all of the appropriate

23   statutory considerations, and they impose no greater

24   deprivation of liberty than reasonably necessary under the

25   statute.

```
 1                    I find that you don't have the ability to pay a

 2       fine in addition to your restitution obligations, so I'm

 3       waiving a fine.

 4                    You must, however, pay the mandatory special

 5       assessment of $100, due and payable immediately to the

 6       United States.

 7                    You are ordered to pay restitution in the amount of

 8       $1,185,691.38.  Restitution shall be paid to the District

 9       Clerk's Office in Lubbock, Texas, for disbursement to your many

10       victims.  Those victims were noted in the conditions of

11       supervision.

12                    Mr. Sloan, I'd be glad to read those victims and

13       the restitution amounts, as well, today.  You've already

14       received notice of them.  Would you like me to read them, or do

15       you waive that?

16                    MR. SLOAN:  We waive that.

17                    THE COURT:  Okay.  And same for the United States?

18                    MS. HOWEY:  Yes, Your Honor.

19                    THE COURT:  The only addition to that list is the

20       additional victim of--is it Elisas, E-l-i-s-a-s?

21                    MS. HOWEY:  I believe so.

22                    THE COURT:  Elisas Zurita, Z-u-r-i-t-a.

23                    MR. SLOAN:  Your Honor, in his letter, he indicated

24       it's Elias, E-l-i-a-s.

25                    THE COURT:  E-l-i-a-s?  Okay.  We'll double-check
```

1    that.  Zurita, Z-u-r-i-t-a, in the amount of $961.73.  That's

2    the only addition.  And the defendant has waived reading, but

3    all of the victims--there's a list.  You've seen that list,

4    sir, and the amounts and the damage that you caused them.  You

5    have to pay them back.

6            If, upon the commencement of your term of

7    supervision, any part of that restitution amount remains

8    unpaid, you shall make payments on the unpaid balance beginning

9    60 days from release from custody at a rate of at least $250

10   per month until paid in full.

11           I'm going to recommend that, while incarcerated,

12   you receive appropriate substance abuse and mental health

13   treatment, but I didn't lengthen your term of imprisonment to

14   promote rehabilitation, because I'm barred from doing so.

15           Sir, to the extent you have not waived your right

16   to appeal, you do have the right to appeal your conviction and

17   your sentence.  If you'd like to appeal, you need to file a

18   notice of appeal within 14 days of today in this court.  If you

19   want to do that, just tell Mr. Sloan.  He's very familiar with

20   that process, and he can get that done for you.

21           He can also ask that the costs of the appeal go to

22   the United States, and not to you.

23           Do you understand those rights, sir?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  I'm sorry?

 1                    THE DEFENDANT:  Yes, sir.

 2                    THE COURT:  All right.  Mr. Sloan, anything else?

 3                    MR. SLOAN:  Yes, Your Honor.  We would object to

 4     the length of the sentence as both procedurally and

 5     substantively unreasonable.

 6                    In terms of the procedural unreasonableness, it's

 7     our position that it's unreasonable for the Court to

 8     essentially stack this case to the sentences he is already

 9     serving and not provide credit for those--

10                    THE COURT:  Okay.  Let me jump in there.  I did

11     adjust the sentence downward to account for that time.  I'm not

12     applying credit, because there's just so many different cases

13     here and the amount of time.  I considered a longer sentence,

14     and I have accounted for that.

15                    But I understand that procedural objection.  It's

16     overruled.  What's next?

17                    MR. SLOAN:  The substantive objection is

18     essentially what we have already stated, that the factors that

19     the Court has identified as bases for upwardly varying are

20     already accounted for in the PSR and in the Court's denial of

21     acceptance, and therefore, the sentence is substantively

22     unreasonable as imposed.

23                    THE COURT:  Okay.  I understand that, as well.  It

24     is also overruled for the reasons I have stated.  I don't think

25     those things are sufficiently or reasonably accounted for in

1    light of just this incredibly unique case.

2              Anything else from the United States?

3              MS. HOWEY:  No, Your Honor.  Thank you.

4              THE COURT:  Okay.  At this time, Mr. Bryant, you

5    are remanded to the custody of the United States Marshal.  Good

6    luck to you, sir.

7        (END OF HEARING)

8

9        I, Mechelle Daniel, Federal Official Court Reporter in and
     for the United States District Court for the Northern District
10   of Texas, do hereby certify pursuant to Section 753,
     Title 28, United States Code, that the foregoing is a true and
11   correct transcript of the stenographically reported proceedings
     held in the above-entitled matter and that the transcript page
12   format is in conformance with the regulations of the Judicial
     Conference of the United States.

13

14    /s/ *Mechelle Daniel*                **DATE** MAY 3, 2023

15   MECHELLE DANIEL, CSR #3549
     FEDERAL OFFICIAL COURT REPORTER

16

17

18

19

20

21

22

23

24

25